UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT R.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 2:23-cv-10989
District Judge George Caram Steeh
Magistrate Judge Kimberly G. Altman

_____

**REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 15)**

## I.      Introduction

This is a social security case. Plaintiff Robert R. brings this action under 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) under the Social Security Act (the Act). Both parties have filed motions for summary judgment, (ECF Nos. 11, 15), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B), (ECF No. 17).

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials. *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

For the reasons set forth below, the undersigned **RECOMMENDS** that Plaintiff's motion, (ECF No. 11), be **DENIED**; the Commissioner's motion, (ECF No. 15), be **GRANTED**; and the decision of the Administrative Law Judge be **AFFIRMED**.

## II.    Background

### A.    Procedural History

Plaintiff is 60 years old and filed an application for disability benefits under Title II of the Social Security Act on August 9, 2019, alleging a disability onset date of March 7, 2018. (ECF No. 8-1, PageID.122). He previously filed three other applications for disability benefits, but in prior ALJ decisions dated May 18, 2010, September 5, 2013, and August 9, 2017, each found that he was not disabled. (*Id.*, PageID.88, 107, 144). At the same time as this disability application, he also filed an application to proceed in district court without prepaying fees or costs, (ECF No. 2), which was approved. (ECF No. 6).

Under Social Security Administration agency regulations, Plaintiff's age at the time of the alleged disability onset (53 years old), (ECF No. 8-1, PageID.122), put him in the category of a person closely approaching advanced age.[2] (*Id.*); 20 C.F.R. § 404.1563. He graduated high school in 1982, later joined the Navy for

---

[2] For persons aged 50-54, it is considered that their age, along with a severe impairment(s) and limited work experience, may seriously affect their ability to adjust to other work. 20 C.F.R. § 404.1563(d).

four years, and previously worked as a shipping and receiving clerk.  (ECF No. 8-1, PageID.322, 347, 723).  In his application, Plaintiff alleged disability due to bipolar 1 disorder; schizoaffective disorder; seizure disorder; severe anxiety; and severe depression.  (*Id.*, PageID.158).

Plaintiff's application was denied initially on February 13, 2020, and upon reconsideration on July 1, 2020.  (*Id.*, PageID.42).  Plaintiff then submitted a written request for a hearing before an Administrative Law Judge (ALJ) and a hearing was held before ALJ Brian Burgtorf.  (*Id.*).  Due to the COVID-19 pandemic, Plaintiff appeared and testified by online video at the hearing, as did a vocational expert.  (*Id.*).  Plaintiff was represented by counsel and offered the following testimony:

- Plaintiff has near-daily (5 days per week) auditory hallucinations, infrequent visual hallucinations, headaches, stomach aches, and side effects, such as dizziness, from his prescribed medications.  (*Id.*, PageID.65, 68-70).

- His symptoms have worsened in the last four years and he is no longer an active person who mountain bikes or even performs household tasks like driving to the grocery store; instead he feels "tired all the time," and the combination of his seizure disorder and his medication make driving unadvisable.  (*Id.*, PageID.66).

- Leaving his home to go in-person to his medical appointments is

3

overwhelming and uncomfortable even though he only sees his primary care physician about once every six months, and he didn't think longer time periods in-between seeing his physician would make the visits easier.  (*Id.*, PageID.67).

- He did take anti-anxiety medication (Klonopin) to alleviate nervousness before going to primary care visits, but the medication made him tired.  (*Id.*, PageID.68).

- He only gets two to four hours of sleep per night, often feels extremely tired during the day, and takes multiple naps per day.  (*Id.*, PageID.68-69).

- Hi agoraphobia, paranoia, and anxiety cause him distress, such as tremors, body shakes, and vomiting, and he usually goes to a dark room for a couple of hours to alleviate the issue.  (*Id.*, PageID.70-71).

- He is able to cook microwaved meals for himself but his fatigue from depression requires him to take frequent breaks when attempting household chores.  (*Id.*, PageID.71-72).

- He has a poor ability to focus and could not follow along with the dialog of a television show that he often used to watch.  (*Id.*, PageID.72-73).

- He gets easily winded when playing indoors with his dog or performing household chores and attributed this to his depression.  (*Id.*, PageID.73, 75-76).

4

On January 3, 2022, the ALJ issued a decision finding that Plaintiff was not disabled. (*Id.*, PageID.53). On March 22, 2023, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.26-28). Plaintiff timely filed for judicial review of the final decision. (ECF No. 1).

### B.    Medical Evidence

The medical records show that Plaintiff began treating with physician assistant Cody Lawnichak on June 29, 2018. (ECF 8-1, PageID.475-501, 527-534). At this visit, he stated that his problems started in 1989 when he learned of his wife's infidelity and they subsequently divorced. (*Id.*, PageID.527). Prior to the divorce, he first experienced depression in 1982 following the death of his father, who he was very close to. (*Id.*, PageID.684). He also first experienced mania in the early 1990s and was hospitalized three times around that time. (*Id.*). At the June 2018 visit, he complained of depression and anxiety, but denied feeling stressed, panicked, having suicidal thoughts, mental disturbances, or hallucinations. (*Id.*, PageID.530). Plaintiff had a PHQ-2[3] score of 6 and felt that

---

[3] The PHQ-2 (Patient Health Questionnaire-2) inquires about the frequency of depressed mood over the past two weeks and its purpose is to screen for depression. PHQ-2 scores range from 0-6, with scores of 3 or greater indicating major depressive disorder is likely. NATIONAL HIV CURRICULUM, https://www.hiv.uw.edu/page/mental-health-screening/phq-2 (last visited July 30, 2024).

he had been taking his current medication for so long that it was no longer effective. (*Id.*, PageID.527).  Plaintiff was prescribed new medication in an attempt to increase his mood. (*Id.*, PageID.531).

On August 23, 2018, Plaintiff presented for a follow up visit regarding his mood with Lawnichak and reported that his depression was improved and he was able to ride his bike for an eighth of a mile, which is approximately the length of two football fields. (*Id.*, PageID.498).  He also complained that the new medication was causing him nausea, difficulty sleeping, and anorgasmia (delayed, infrequent, or absent orgasms). (*Id.*).  He reported experiencing depression and anxiety but denied feelings of hopelessness, feeling stressed, panic, obsessing, suicidal thoughts, hallucinations, or not feeling safe at home. (*Id.*, PageID.499). Lawnichak noted that Plaintiff was alert and oriented to person, place, and time and had a normal mood and affect. (*Id.*, PageID.500).

On October 12, 2018, Plaintiff presented for another follow up visit regarding his mood with Lawnichak and reported that his current medication was working well but it caused side effects such as nausea and sweating and he was constantly worried about other potential side effects. (*Id.*, PageID.494). Lawnichak again noted that Plaintiff was alert and oriented to person, place, and time and had a normal mood and affect. (*Id.*, PageID.495).  Lawnichak recommended discontinuing the medication that was causing nausea. (*Id.*).

6

On November 12, 2018, Plaintiff presented for a follow up visit with Lawnichak and reported that he was adjusting well to his Latuda (depression) medication and his mood was improving.  (*Id.*, PageID.490).  He complained of depression and anxiety but denied feelings of hopelessness, feeling stressed, panic, or suicidal thoughts.  (*Id.*, PageID.491).  Lawnichak noted that Plaintiff was alert and oriented to person, place, and time and had a normal mood and affect.  (*Id.*).

The following year, on April 19, 2019, Plaintiff saw Lawnichak and reported his anxiety and depression were worse and he was still not sleeping well, only getting two to three hours of disjointed sleep per night.  (*Id.*, PageID.485).  At this visit, Plaintiff's PHQ-2 score was a 6.  (*Id.*).  Lawnichak described his mental status as alert/cooperative with good insight, intact memory, normal judgment, and he was oriented to person, place, and time.  (*Id.*, PageID.487).  Lawnichak also noted that Plaintiff recently received news regarding the paternity of his adult daughter and this had worsened his depression.  (*Id.*).  As a result, Lawnichak recommended increasing his dosage of Seroquel (depression medication).  (*Id.*).

On a June 10, 2019 visit with Lawnichak, Plaintiff complained of depression, hopelessness, and anxiety but denied feeling panicked, obsessing, having suicidal thoughts, or hallucinations.  (*Id.*, PageID.482).  Plaintiff's PHQ-2 score was again a 6.  (*Id.*, PageID.480).  The medical notes also indicate that Plaintiff still suffered from bipolar disorder and major depression but was very

resistant to treatment.  (*Id.*, PageID.482).

A month later on July 19, 2019, Plaintiff told Lawnichak that his depression was well-controlled due to medication, but he had increased anxiety because of an upcoming move.  (*Id.*, PageID.475).  He also stated he had no suicidal thoughts and denied feeling stressed or panicked.  (*Id.*, PageID.477).  His PHQ-2 score was 3.  (*Id.*, PageID.475).  Lawnichak noted Plaintiff was alert and cooperative, with fair insight and he was oriented to person, place, and time.  (*Id.*, PageID.477).  Lawnichak also recommended Plaintiff take an eye exam due to the Seroquel medication he was taking.  (*Id.*, PageID.475).

During an August 19, 2019 visit, Plaintiff complained to Lawnichak of "unrelenting" anxiety but denied depression, hopelessness, feeling stressed, panicked, or having suicidal thoughts.  (*Id.*, PageID.472-473).  His PHQ-2 score at this visit was 4.  (*Id.*, PageID.472).  Lawnichak also noted that Plaintiff was alert and oriented, with a normal mood and affect, (*id.*, PageID.473), and recommended no changes to Plaintiff's medication but Plaintiff's care would be transitioned to Dr. Monica Arora, who is a psychiatrist.  (*Id.*, PageID.474).

At a November 11, 2019 visit, Plaintiff again complained of depression and anxiety, but denied felling stressed, panic, suicidal thoughts, mental disturbance, or hallucinations.  (*Id.*, PageID.523).  He also stated that he had no difficulty with concentration or memory loss.  (*Id.*).  Lawnichak again noted that Plaintiff was

alert and oriented, with a normal mood and affect, (*id.*, PageID.524), and recommended Plaintiff follow up with psychiatry.  (*Id.*, PageID.525).

On January 10, 2020, Plaintiff presented to social worker Nina Niemetta and reported manic symptoms, infrequent and vague suicidal ideation, both auditory and visual hallucinations, significant and impairing racing thoughts, and extremely high distractibility.  (*Id.*, PageID.616).  His PHQ-2 score at this visit was 6.  (*Id.*, PageID.621).  Niemetta prepared a mental status assessment and noted Plaintiff's hygiene was adequate with appropriate dress and good eye contact.  (*Id.*, PageID.624).  However, she also noted Plaintiff was quite inattentive with some flight of ideas (rapid, erratic speech) present.  (*Id.*).

On January 14, 2020, Plaintiff underwent a psychological consultative examination with psychologist Dr. Kathryn Pekrul.  (*Id.*, PageID.546).  At the exam, Plaintiff complained of depression, anxiety, daily fatigue, and difficulty sleeping.  (*Id.*, PageID.547-548).  He also reported low self-esteem, a lack of motivation, hallucinations, paranoia, extreme changes in mood, daily panic attacks, and feelings of hopelessness and helplessness.  (*Id.*, PageID.547).  Upon examination, Dr. Pekrul noted Plaintiff's grooming and hygiene were appropriate and he maintained appropriate eye contact.  (*Id.*, PageID.549).  She also found no symptoms of psychosis present; Plaintiff appeared in good contact with reality; he had a kind, friendly, and likeable manner; his social skills were appropriate; and he

9

was well spoken.  (*Id.*, PageID.548-549).  As to his mental status, Dr. Pekrul found

Plaintiff had adequate insight; his thoughts were logical, coherent, and presented at

an even pace and with reasonable clarity; and he was fully oriented.  (*Id.*,

PageID.549).  Dr. Pekrul also administered several tests to determine Plaintiff's

mental capacity that showed (1) he was unable to repeat any numbers forwards or

backwards; (2) he recalled zero out of three items after three minutes; (3) he was

able to name large cities and the current president but was unable to name past

presidents or famous people; (4) he correctly answered three of four simple

calculations; and (5) he reported he was unable to do serial 7's.  (*Id.*, PageID.549-

550).  In her notes, Dr. Pekrul diagnosed Plaintiff with panic disorder without

agoraphobia; unspecified bipolar and other related disorder; unspecified

schizophrenia spectrum and other psychotic disorder; and his prognosis was highly

guarded.  (*Id.*, PageID.551).

On February 26, 2020, Plaintiff completed a psychosocial evaluation with

social worker David Agee.  (*Id.*, PageID.695-700).  Plaintiff presented with

symptoms of anhedonia, depressed mood, feelings of guilt and shame, decreased

energy, poor concentration, sleep difficulties, feelings of

hopelessness/helplessness, episodes of crying, feeling empty inside, irritability,

poor memory, difficulty making decisions, being easily distracted, racing thoughts,

decreased need for sleep at times, anxiety, worry, and avoidance of people and

places, but his main concern was his anxiety.  (*Id.*, PageID.695).  A mental status exam showed Plaintiff was restless, depressed, and anxious, but also engaged, friendly, and cooperative; and was fully oriented.  (*Id.*, PageID.697-698).  He demonstrated a logical and linear thought process; had no hallucinations or response to internal stimuli; no evidence of delusional framework; demonstrated appropriate insight and judgment; was attentive; and had intact memory and appropriate fund of knowledge.  (*Id.*).  Agee diagnosed Plaintiff with schizoaffective disorder, bipolar type; generalized anxiety disorder; and agoraphobia.  (*Id.*, PageID.699).

A March 10, 2020 visit with Lawnichak reflected that Plaintiff suffered from bipolar disorder, severe anxiety, and depression.  (*Id.*, PageID.605).  At the visit, Plaintiff also complained of depression, anxiety and panic but denied feelings of hopelessness, feeling stressed, or suicidal thoughts.  (*Id.*, PageID.606).  On the same day, Plaintiff also met with Niemetta and she noted Plaintiff maintained appropriate eye contact and his grooming and hygiene were good.  (*Id.*, PageID.614).  As to his mental status, she stated Plaintiff was alert, oriented, and cooperative.  (*Id.*).

On April 8, 2020, Plaintiff presented to Nurse Faith Huyck for evaluation.  (*Id.*, PageID.683).  In that visit, Plaintiff recounted his prior history, including previous diagnoses of bipolar I disorder, schizoaffective disorder, and PTSD; his

first experience of depression in 1982; and his first experience of mania in the early 1990s and subsequent hospitalizations. (*Id.*, PageID.684). Plaintiff also recounted his history of visual and auditory hallucinations; his nightmares; and his difficulty sleeping. (*Id.*). Nurse Huyck noted that from July to November 2019, Plaintiff was on 300mg of Seroquel and stated this medication was effective for his sleep and psychosis, but he later developed cataracts in both eyes and the dosage was reduced in November 2019. (*Id.*). Since then, Plaintiff's sleep and anxiety have worsened. (*Id.*). At the visit, Plaintiff reported feeling "more depressed than usual" and admitted he had occasional suicidal thoughts. (*Id.*, PageID.684-685).

In an April 17, 2020 visit with Nurse Huyck, Plaintiff reported continuing to wake up repeatedly during the night, bad dreams, and not getting enough rest. (*Id.*, PageID.673). He also stated it takes him 90 minutes to fall asleep and that he has suicidal thoughts. (*Id.*, PageID.673). The results of a mental status exam showed he was dressed appropriately and well-groomed, he was alert and awake with good eye contact, and his attitude was friendly, engaged and cooperative, although he was still depressed and anxious. (*Id.*, PageID.675). His insight was also good and his fund of knowledge was appropriate. (*Id.*, PageID.676).

In a May 1, 2020 visit with Agee, Plaintiff presented with symptoms of paranoia, fear, strange dreams, and reported a recent manic episode with anxiety. (*Id.*, PageID.669). Agee also noted that Plaintiff believed the Remeron medication

12

was helping his depression improve.  (*Id.*, PageID.671).

During a May 8, 2020 visit with Agee, Plaintiff presented with symptoms of anxiety with worry, irritability, foreshadowing, anhedonia, depressed mood, sleep difficulties, low energy, tiredness, poor appetite, and poor concentration.  (*Id.*, PageID.665).  During another visit with Agee on May 15, 2020, Plaintiff presented with symptoms of paranoid thinking, avoidant behavior, anxiousness with panic, irritability, and sleep disturbance.  (*Id.*, PageID.661).  He also reported helping his brother install a fence for his dog and going outside during the day to play with the dog.  (*Id.*, PageID.663).

On September 18, 2020, Plaintiff met with Nurse Huyck and reported a recent manic episode he had, where he experienced racing thoughts, difficulty sleeping, and the urge to organize things in the garage.  (*Id.*, PageID.809).  He also reported feeling depressed and continued to have a tremor in his right hand.  (*Id.*).  Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment.  (*Id.*, PageID.811-812).

On October 30, 2020, Plaintiff presented to Nurse Huyck and complained of feeling tired due to inadequate sleep but denied experiencing nightmares.  (*Id.*, PageID.800).  He also continued to experience essential tremors that made it

13

difficult to drink from a glass or hold a can of soda. (*Id.*). Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.803).

On November 25, 2020, Plaintiff presented to Nurse Huyck and reported he still had nighttime awakenings despite the change in his medication but that he was able to go back to sleep after awakening. (*Id.*, PageID.791). He also described a "noticeable improvement" in his tremors but said there was still slight shaking when holding a glass or texting on a phone. (*Id.*, PageID.795). Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.794).

On December 29, 2020, Plaintiff presented again to Nurse Huyck and reported that his tremors were about the same as in his last visit and that his sleep was "pretty good." (*Id.*, PageID.786). He also stated that he stopped drinking six or seven cans of soda per day and felt this would also improve his sleep. (*Id.*). And he reported a recent driving accident he was involved in that resulted in no injuries to him but made him nervous to drive again. (*Id.*). Nurse Huyck

14

conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.788-789).

On January 29, 2021, Plaintiff saw Nurse Huyck again and reported he was "feeling pretty good" in terms of his mood and sleeping better with fair energy during the day. (*Id.*, PageID.777). Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.779-780).

On March 30, 2021, Plaintiff presented to Nurse Huyck and reported a number of positive developments, including good mood, improved sleep, and staying busier during the day. (*Id.*, PageID.768). He also reported that while he was still waking up during the night, he was able to fall back asleep quickly and he was still experiencing tremors in his right hand. (*Id.*). Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.770-771).

15

On April 28, 2021, Plaintiff met with Nurse Huyck for a follow-up visit and described experiencing middle of the night hallucinations of a deceased pet at least four times in the past three weeks.  (*Id.*, PageID.763).  He reported his sleep was getting worse and that his Rozerem medication, while initially effective at helping him sleep, did not seem to be working as well now.  (*Id.*).  He also had an ongoing tremor in his right hand that interfered with eating and using his phone.  (*Id.*).  Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment.  (*Id.*, PageID.765-766).

On April 30, 2021, Plaintiff met with Lawnichak to discuss a prior diagnosis of essential tremors.  (*Id.*, PageID.722).  At this visit, Plaintiff stated his mood was good and his PHQ-2 score was found to be 0.  (*Id.*).  His mental status at the visit was alert and cooperative, his insight was fair, and he denied depression, anxiety, feeling stressed, or suicidal thoughts.  (*Id.*, PageID.724).

On May 20, 2021, Plaintiff presented to Agee for a therapy visit.  (*Id.*, PageID.761).  At the visit, Plaintiff discussed solving medication issues with Nurse Huyck and was hopeful that the new Latuda medication would work better than his previous medications.  (*Id.*, PageID.762).  Agee noted that Plaintiff was demonstrating good progress in treatment because he was getting out more and

was more active.  (*Id.*).

During a June 30, 2021 visit with Nurse Huyck, Plaintiff reported feeling "not too bad [but] a little more down lately." (*Id.*, PageID.756).  Overall, he stated the changes in medication were working and he was able to sleep through the whole night.  (*Id.*).  His Latuda medication was also "working," and he stated his mood was improved but could still be better.  (*Id.*).  Plaintiff also described feeling well enough to challenge himself by attempting to pick up his medication from the pharmacy by himself.  (*Id.*).  Nurse Huyck conducted a mental status exam and found Plaintiff appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment.  (*Id.*, PageID.759).

On July 28, 2021, Plaintiff reported to Nurse Huyck that he was "not so good" and feeling more down due to the recent deaths of an uncle and a friend. (*Id.*, PageID.748).  He also reported paying less attention to his activities of daily living and that his sleep routine was disturbed, with him now sleeping during the day and staying awake at night.  (*Id.*).  His mental status exam showed Plaintiff was appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment.  (*Id.*, PageID.751-752).

During an August 31, 2021 visit with Nurse Huyck, Plaintiff reported increased regrets, irritability, tearfulness, more difficulty sleeping, nightmares, and more depression after visiting the grave sites of family members. (*Id.*, PageID.738). He also reported continuing tremors in his right hand. (*Id.*). His mental status exam showed Plaintiff was appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.741-742).

During a September 24, 2021 visit with Nurse Huyck, Plaintiff reported a negative encounter with his sister-in-law that was causing him to have increased dreams of his deceased mother, increased body trembling, worsening of the tremor in his right hand, and he had been more tearful. (*Id.*). His mental status exam showed Plaintiff was appropriately dressed and well groomed; alert and awake; friendly, engaged, and cooperative with good eye contact; fully oriented; with appropriate insight; appropriate fund of knowledge; and appropriate judgment. (*Id.*, PageID.733).

On October 14, 2021, Nurse Huyck assessed Plaintiff's mental residual functional capacity. (*Id.*, PageID.712-715). In her notes, she stated Plaintiff had extreme anxiety when leaving his home, interacting with others, or when plans change. (*Id.*, PageID.715). She also noted that his mood symptoms were varied

18

but that they did affect his ability to function socially.  (*Id.*).  Nurse Huyck

concluded that Plaintiff had marked limitations in his understanding and memory,

such as the ability to:

- remember locations and work-like procedures;

- understand and remember detailed instructions;

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform activities within a schedule, maintain regular attendance, and be
  punctual;

- sustain an ordinary routine without special supervision; and

- work in coordination with or proximity to others without being distracted by
  them.

(*Id.*, PageID.713).  As to his sustained concentration and persistence, Nurse Huyck

found he was markedly limited in his ability to complete a normal workday and

workweek without interruptions from psychologically-based symptoms, and

perform at a consistent pace without an unreasonable number and length of rest

periods.  (*Id.*, PageID.714).  She further opined that Plaintiff had marked

limitations in his ability to interact appropriately with the general public, accept

instructions and respond appropriately to criticism from supervisors, get along with

coworkers without distracting them or exhibiting behavioral extremes, and travel in

19

unfamiliar places or use public transportation. (*Id.*). In all the other mental functional abilities she assessed, Nurse Huyck opined that Plaintiff was moderately limited. (*Id.*, PageID.713-714).

As to Plaintiff's cataracts, on August 13, 2019, Plaintiff presented to Dr. Anna Kleinebreil and complained of blurry vision, eye fatigue, and difficulty seeing that he blamed on increases to his medication dosages. (*Id.*, PageID.458, 461). He also reported feeling as if not enough light was entering his eye. (*Id.*, PageID.461). Dr. Kleinebrell noted the presence of a significant accommodative spasm that caused Plaintiff fatigue and she advised lowering Plaintiff's Seroquel dosage. (*Id.*, PageID.565). She diagnosed Plaintiff as having immature age-related nuclear (affecting the center of the lens) cataracts in both eyes. (*Id.*, PageID.466).

On September 10, 2019, Plaintiff presented to Dr. Brian Wade for a second opinion that was recommended by Dr. Kleinebreil. (*Id.*, PageID.510). Plaintiff complained of blurry vision in both eyes and difficulty with reading small print. (*Id.*). After examination, Dr. Wade opined that Plaintiff had presbyopia (gradual loss of ability to focus on nearby objects) in both eyes, but testing showed no macular pathology and the most likely cause was side effects from his medications. (*Id.*, PageID.511). An eye examination also showed Plaintiff's corrected visual acuity was 20/40 in the right eye and 20/50 in the left eye. (*Id.*, PageID.512).

20

On December 9, 2019, Plaintiff saw Dr. Kleinebreil and reported experiencing pain behind his eyes that felt like an ice pick, and that his eyes were itchy and there was a cloudy ring in his field of vision. (*Id.*, PageID.573). Dr. Kleinebreil noted that his Seroquel medication had been reduced by 100mg on November 19, 2019, by Dr. Arora. (*Id.*).

On February 17, 2020, Plaintiff had another cataract evaluation with Dr. Kleinebreil, where she diagnosed Plaintiff with visually significant cataracts in both eyes and scheduled him for future surgery. (*Id.*, PageID.580). At this visit, Plaintiff's corrected visual acuity was again 20/40 in the right eye and 20/50 in the left eye. (*Id.*). His optic nerve fiber layer was within normal limits in all four quadrants of both eyes. (*Id.*, PageID.704).

On June 2, 2020, as part of his disability claim, Plaintiff submitted a function report where he reported:

- Suffering from PTSD, which caused him vivid night dreams, depression; severe anxiety; a fear of public places and being outside; and that he does not spend time with others, with the exception of his brother. (*Id.*, PageID.411, 413-415, 421).

- His medications make him confused and he experienced nightmares, daymares, flashbacks of traumatic events, and problems with sleeping. (*Id.*, PageID.410, 413, 414).

21

- He experiences muscle weakness and has problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, getting along with others, and does not handle stress or changes in routine well. (*Id.*, PageID.410, 415-416).

On July 23, 2020, Plaintiff presented to Dr. Kleinebreil because his eyes were watery due to allergies and itched a lot, and he did not want to proceed with his cataract surgery at that time. (*Id.*, PageID.716). Dr. Kleinebreil recommended artificial tears for his dry eyes and prescribed Azelastine (antihistamine) for at least the following four months. (*Id.*, PageID.721).

### III. Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was

not disabled under the Act.  (ECF No. 8-1, PageID.42-53).  At Step One, the ALJ

found that Plaintiff had not engaged in substantial gainful activity since August 9,

2019, the alleged onset date.  (*Id.*, PageID.45).  At Step Two, the ALJ found that

Plaintiff had the severe impairments of anxiety disorder, depressive disorder,

schizophrenia, and cataracts.  (*Id.*).  The ALJ also found that Plaintiff had the non-

severe impairment of seizure disorder.  (*Id.*).  At Step Three, the ALJ found that

none of Plaintiff's impairments met or medically equaled a listed impairment.  (*Id.*,

PageID.45-47).

The ALJ then assessed Plaintiff's residual functional capacity (RFC),

concluding that he was capable of performing a full range of work at all exertional

levels, except:

> he can never work around hazards, such [as] unprotected heights or
> unguarded or unprotected moving mechanical parts.  He can never
> engage in commercial driving.  He can never climb ladders, ropes, or
> scaffolds.  [Plaintiff] can understand, remember, and carry out simple
> instructions and make simple work-related decisions.  He cannot work
> at a production rate pace, such as on an assembly line.  He can tolerate
> occasional changes in the routine work setting.   He can have
> [occasional] interaction with coworkers, but can never interact with the
> general public.

(*Id.*, PageID.47).

At Step Four, the ALJ found that Plaintiff was unable to perform any past

relevant work.  (*Id.*, PageID.51-52).  In considering Plaintiff's age, the ALJ found

that Plaintiff's age category under the Act was that of an individual of advanced

age.[4]  (*Id.*, PageID.52).  But because the ALJ found Plaintiff capable of performing

a full range of work, (*Id.*, PageID.47), this section of the Act is inapplicable.  *See*

§ 416.968(d)(4).  Thus, in considering Plaintiff's age, education, work experience,

and RFC, the ALJ determined that Plaintiff could perform the jobs of recycling

plant laborer (50,000 jobs nationally), laundry laborer (60,000 jobs), and hand

packager (90,000 jobs), which exist in significant numbers in the national

economy.  (*Id.*).  As a result, the ALJ concluded that Plaintiff was not disabled

under the Act.  (*Id.*).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although a court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health*

*& Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial

review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224-25 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,

---

[4] Under the Act, individuals of advanced age, who also have a severe impairment
that limits them to *sedentary* or *light* work, are presumed to be unable to make an
adjustment to other work unless certain other conditions apply.  *See*
§ 416.968(d)(4) (emphasis added).

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139

S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence." 42

U.S.C. § 405(g). The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("'The substantial-evidence standard .

. . presupposes that there is a zone of choice within which the decisionmakers can

go either way, without interference by the courts.'" (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless

the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial.
The court must "'take into account whatever in the record fairly detracts from [the]
weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395
(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487
(1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this
Court defers to that finding even if there is substantial evidence in the record that
would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal
quotation marks and citation omitted). Finally, even if the ALJ's decision meets
the substantial evidence standard, "a decision of the Commissioner will not be
upheld where the [Social Security Administration (SSA)] fails to follow its own
regulations and where that error prejudices a claimant on the merits or deprives the
claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,
651 (6th Cir. 2009) (internal quotation marks and citations omitted).

V.    Analysis

A.    Parties' Arguments

Plaintiff argues that the ALJ's decision is not supported by substantial
evidence because he (1) failed to properly evaluate Nurse Huyck's medical opinion
under current regulations, and (2) erred in evaluating Plaintiff's subjective
symptoms by finding them not consistent or supported by the record evidence. In
response, the Commissioner argues that both findings were supported by

27

substantial evidence.

## B.     Opinion Evidence

### 1.     Standard

When evaluating a medical opinion, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  § 404.1520c(c).  Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision.  § 404.1520c(b)(2).

### 2.     Nurse Huyck's Opinion

Regarding Plaintiff's mental limitations, the ALJ considered the opinion of Plaintiff's treating psychiatric nurse practitioner, Faith Huyck.  (ECF No. 8-1, PageID.46-48, 50-51).  The ALJ found Nurse Huyck's medical opinion unpersuasive because the marked limitations she found when examining Plaintiff were not consistent with his mental status examinations, which generally showed that while Plaintiff suffered from depressed or anxious mood with some concentration difficulties and reported hallucinations, he also had generally intact

28

memory, a logical and linear thought process, no suicidal ideation, and fair to good judgment and insight.  (*Id.*, PageID.50-51).

On October 14, 2022, Nurse Huyck authored an assessment of Plaintiff's mental residual functional capacity.  (*Id.*, PageID.713-715).  In her assessment, she concluded that Plaintiff had marked limitations in his understanding and memory, such as the ability to:

- remember locations and work-like procedures;

- understand and remember detailed instructions;

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform activities within a schedule, maintain regular attendance, and be punctual;

- sustain an ordinary routine without special supervision; and

- work in coordination with or proximity to others without being distracted by them.

(*Id.*, PageID.713).  As to his sustained concentration and persistence, Nurse Huyck found he was markedly limited in his ability to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms, and (2) perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*, PageID.714).  She further opined that Plaintiff had marked

29

limitations in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, and travel in unfamiliar places or use public transportation. (*Id.*). In all other mental functional abilities assessed, Nurse Huyck opined that Plaintiff was only moderately limited. (*Id.*, PageID.713-714). On the part of the assessment where she was asked to elaborate on her findings and explain her conclusions in narrative form, Nurse Huyck wrote two sentences that only described some of Plaintiff's symptoms: "Extreme anxiety when leaving home, interacting with others, change in plans. Mood symptoms vary day-to-day & effect ability to function socially." (*Id.*, PageID.715).

The ALJ found Nurse Huyck's opinion unpersuasive because the "extreme limitations" she found were not consistent with Plaintiff's other mental status examinations in the medical record. (*Id.*, PageID.50-51). The ALJ then contrasted the findings from Nurse Huyck's assessment by comparing them to some of the findings from the various mental status examinations of Plaintiff during the relevant period, which showed that while Plaintiff was depressed or had an anxious mood, along with some concentration difficulties, and reported hallucinations, he also had generally intact memory, a logical and linear thought process, no suicidal ideation, and fair to good judgment and insight. (*Id.*).

30

Separately from his specific analysis of Nurse Huyck's opinion, the ALJ made findings regarding Plaintiff's mental impairments.  In doing so, he reviewed the overall medical record and treatment visit notes and then made specific findings based on the overall record.  (*Id.*, PageID.48).  Although not explicitly stated, some of these ALJ findings directly contradict Nurse Huyck's assessment of Plaintiff's limitations, such as her finding that Plaintiff had marked limitations in seven areas of mental activity dealing with his understanding and memory.  (*Id.*, PageID.713).  In contrast, the ALJ found Plaintiff's memory generally intact, his thought process occasionally circumstantial but often logical and linear, he was lucid, his fund of knowledge was generally appropriate, his insight was fair to good, and his judgment was within normal limits.  (*Id.*, PageID.48).  These findings drew support from the medical record as summarized above.

Nurse Huyck assessed Plaintiff as being markedly limited in 3 out of 5 areas of social interaction, such as his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them or exhibiting behavioral extremes.  (*Id.*, PageID.714).  In contrast, the ALJ found that the record showed Plaintiff's grooming and hygiene were appropriate; he was alert and oriented; cooperative; he maintained appropriate eye contact; he was occasionally inattentive and needed to be redirected but was often attentive; and while he reported

31

experiencing auditory hallucinations, he generally did not appear to respond to internal stimuli. (*Id.*, PageID.48).

In short, the ALJ supported his rejection of Nurse Huyck's opinion by finding that Nurse Huyck's assessment of Plaintiff's mental limitations was contradicted by the various mental status examinations Plaintiff underwent, as documented in the medical record. (*Id.*, PageID.50-51).

### 3.     Discussion

Under § 404.1520c(b)(2), the ALJ must specifically address the factors of supportability and consistency.  Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  § 404.1520c(c)(1).  Consistency means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  § 404.1520c(c)(2).  Further, the ALJ is required to provide a "sufficiently detailed articulation of application of those factors in which the ALJ must show their work, i.e., to explain in detail how the factors actually were applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp.

32

1010, 1020 (E.D. Mich. 2022) (cleaned up).  In other words, the regulations

"require that the ALJ provide a coherent explanation of his reasoning."  *Lester v.*

*Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020),

*report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021

WL 119287 (N.D. Ohio Jan. 13, 2021).

Plaintiff argues the ALJ erred by rejecting Nurse Huyck's medical opinion

without properly articulating any consideration as to the supportability of Nurse

Huyck's opinion.  (ECF No. 11, PageID.891-896).  Plaintiff concedes that the ALJ

"expressly articulated consideration of the consistency of [Nurse] Huyck's

opinion," but then argues that the ALJ erred anyway because he did not offer

reasons why Nurse Huyck's opinion was "completely inconsistent" with the

record.  (*Id.*, PageID.892).  As noted above, the ALJ is only *required* to discuss

supportability and consistency, as he did here.  The other factors are still to be

considered, but in the absence of an egregious error, a decision should not be

remanded for failing to discuss these factors.

Here, the ALJ adequately considered the supportability of Nurse Huyck's

opinion even if he did not specifically use that term in his analysis.  *See Hague v.*

*Comm'r of Soc. Sec.*, No. 20-13084-JEL-CI, 2022 WL 965027, at *4 (E.D. Mich.

Mar. 30, 2022) ("It is true that although the ALJ in this case did not name the

factors of 'supportability' and 'consistency' in her analysis . . . her explanation

33

aligns with these factors."); *see also Curtis S. v. Comm'r of Soc. Sec.*, No. 22-cv-11799, 2023 WL 3105141, at *6 (E.D. Mich. Apr. 11, 2023) ("Although the ALJ here did not use the terms 'supportability' and 'consistency' when discussing Dr. Solomon's opinion, other parts of the decision show that she applied those factors."), *report and recommendation adopted*, 2023 WL 3098828 (E.D. Mich. Apr. 26, 2023).

In evaluating the supportability of Nurse Huyck's opinion, the ALJ considered the medical evidence from where Nurse Huyck worked—Pine Rest Mental Health Services at the Traverse City Clinic.  (ECF No. 8-1, PageID.655-700, 728-865).  The ALJ used this evidence in his analysis of Nurse Huyck's opinion, as well as in his analysis of the "paragraph B" criteria, his summary of the objective medical evidence, and his analysis of the persuasiveness of all the medical opinions.  (*Id.*, PageID.46, 48, 50-51).  *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (recognizing that the ALJ's decision should be read as a whole); *Zirker v. Comm'r of Soc. Sec.*, No. 21-cv-12440, 2023 WL 2301998, at *3 (E.D. Mich. Mar. 1, 2023) (an ALJ's analysis "of the persuasiveness of a medical source opinion is not to be read in isolation of the rest of the decision").

Further, Nurse Huyck's evaluation consists almost entirely of checked boxes regarding her opinions about Plaintiff's abilities.  (ECF No. 8-1, PageID.713-714).

34

Many cases have found that such check-box opinions are entitled to little weight. *See, e.g.*, *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016); *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016); *Smith v. Comm'r of Soc. Sec.*, No. 13-12759, 2015 WL 899207, at *15 (E.D. Mich. Mar. 3, 2015) (citing cases); *Ashley v. Comm'r of Soc. Sec.*, No. 1:12–cv–1287, 2014 WL 1052357, at *8 n. 6 (W.D. Mich. Mar. 19, 2014) (citing cases). Nurse Huyck only added two sentences of explanation for her findings, which did not fully explain her assessment of moderate and marked impairments. Thus, Nurse Huyck did not provide the type of explanation that would be sufficient to negate the ALJ's findings that Plaintiff's mental status examinations were unremarkable and showed that Plaintiff's limitations were not disabling.

Plaintiff also contends that Nurse Huyck's opinion is supported by her treatment notes, which indicate that Plaintiff took several different psychiatric medications and required frequent medication adjustments and that the ALJ erred in failing to consider this in his analysis. (ECF No. 11, PageID.894-896). But the ALJ did mention in his analysis that Plaintiff took several medications for his mental impairments and properly observed that the changes were not "significant." (ECF No. 8-1, PageID.47-48). His findings were based on Plaintiff's medical record and capacity to work while on medications. Moreover, even if the record contained evidence that supported Nurse Huyck's opinion, the ALJ's decision

35

would not be overturned because "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (internal citations omitted); *see also Jones*, 336 F.3d at 477 (The ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."). In further articulating the supportability factor, the ALJ also reviewed the overall medical record and made findings showing Plaintiff's lack of mental limitations, based on the numerous mental status examinations Plaintiff underwent during the relevant period. (ECF No. 8-1, PageID.48).

As for consistency, as discussed in more detail above, the ALJ adequately discussed the consistency of Nurse Huyck's opinion, finding that the marked limitations she endorsed were inconsistent with Plaintiff's overall mental status examinations throughout the relevant period, which generally showed less than marked limitations and sometimes no limitations at all. (*Id.*, PageID.48, 50-51). The ALJ fully considered the opinion and explained why it was unpersuasive, noting that Nurse Huyck's findings of Plaintiff's marked mental limitations were contradicted by Plaintiff's other mental status examinations that showed no such limitations. (*Id.*, PageID.50-51).

This is true even when excluding all other mental status examinations and only looking at the mental status examinations Nurse Huyck conducted.  At each of his appointments with Nurse Huyck, Plaintiff appeared alert, calm, friendly, engaged, and cooperative; was fully oriented; demonstrated logical and linear thought process; showed no evidence of delusional framework; had appropriate insight and judgment; was attentive; and had intact memory and intellectual functioning.  (*Id.*, PageID.733, 741-742, 751-752, 759, 765-766, 770-771, 779-780, 789, 794, 803, 811-812, 825, 833-834, 847, 860).  Thus, the ALJ reasonably found this opinion did not support the marked limitations that Nurse Huyck assessed.  (*Id.*, PageID.50-51).

In addition, the ALJ reviewed the findings of state agency psychological consultant Dr. Edward Czarnecki and psychological consultative examiner Dr. Pekrul on February 12, 2020, and January 14, 2020, respectively.  (*Id.*, PageID.49-50).  In each instance, after reviewing the record, the ALJ found the opinion to be generally persuasive because they were "generally consistent" with Plaintiff's overall mental status examinations.  (*Id.*).

In Dr. Czarnecki's opinion, he found Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (*Id.*, PageID.122-138).  Dr. Czarnecki further opined that Plaintiff retained the

mental capacity for occasional social interaction, following simple instructions, and adjusting to occasional change with no production rate demands and supported this assessment with a detailed analysis of the medical record evidence.  (*Id.*).  The ALJ compared these findings to Plaintiff's other mental status examinations and found the conclusions of each generally consistent, and thus generally persuasive. (*Id.*, PageID.49-50).

In Dr. Pekrul's opinion, she found Plaintiff's ability to understand, remember, and apply simple work instructions was mildly impaired.  (*Id.*, PageID.545-552).  She concluded that Plaintiff's ability to carry out simple instructions, make simple work-related decisions, attend work on a consistent basis, and complete a full workday without rest periods were markedly impaired. (*Id.*).  Dr. Pekrul further opined that Plaintiff's ability to interact with coworkers, supervisors, and the public in a socially appropriate manner; ask for help when needed; respond appropriately to criticism; receive direction from authority; to adapt to and manage oneself in changes in work routine; travel in unfamiliar places; use public transportation; and set realistic goals were all moderately impaired.  (*Id.*).  The ALJ again compared these findings to Plaintiff's other mental status examinations and found the conclusions of each generally consistent, and thus generally persuasive, although he qualified this finding by stating that the overall evidence supported moderate, rather than marked limitations in

38

understanding, remembering, and applying simple work instructions and in carrying out simple instructions and attending to work on a consistent basis. (*Id.*, PageID.50). The ALJ then crafted an RFC that aligned with these findings.

Plaintiff argues that the ALJ's reasoning was inadequate because the ALJ did not specifically explain how the mental status examinations from the relevant period were inconsistent with Nurse Huyck's opinion. According to Plaintiff, this failure means it is not clear what evidence was identified that actually conflicted with the medical opinion, citing *Mason v. Comm'r of Soc. Sec.*, No. 22-CV-10012, 2023 WL 2480734 (E.D. Mich. Mar. 13, 2023).

Plaintiff's reliance on *Mason* is misplaced because in *Mason*, the court concluded that it was "not clear [from the ALJ's decision] that any of the evidence identified by the ALJ conflicted with [the doctor's] opinion." *Mason*, 2023 WL 2480734, at *4. This was because the ALJ in *Mason* undermined a doctor's opinion "related to [the plaintiff's] cognitive abilities," by using evidence "relate[d] primarily to [her] emotional health rather than to her cognitive abilities." *Id.* (emphasis in original). In contrast, here, the ALJ pointed to specific cognitive findings from mental status examinations—including evidence about Plaintiff's memory, thought process, judgment, and insight—that undermined Nurse Huyck's opinions about Plaintiff's mental limitations. (ECF No. 8-1, PageID.51). Thus, unlike in *Mason*, it is "clear that . . . the evidence identified by the ALJ conflicted

39

with [Nurse Huyck's] opinion." *See Mason*, 2023 WL 2480734, at *4.

Plaintiff's reliance on *McCauley v. Comm'r of Soc. Sec.*, No. 3:20-CV-13069, 2021 WL 5871527 (E.D. Mich. Nov. 17, 2021), *report and recommendation adopted*, 2021 WL 5867347 (E.D. Mich. Dec. 10, 2021), is similarly misplaced because *McCauley* involved a situation where "[t]he ALJ's description of Plaintiff's psychological symptoms contradict[ed], without any explanation, a substantial portion of the record." *See McCauley*, 2021 WL 5871527, at *11.  For example, the ALJ in *McCauley* stated that the evidence showed that the plaintiff never complained of lacking concentration, while the evidence actually showed that the plaintiff frequently complained of difficulties with concentration.  *Id.*  But here, the ALJ properly observed that Plaintiff's mental status examinations generally demonstrated intact memory, logical and linear thought process, and fair to good judgment and insight.  (ECF No. 8-1, PageID.51).  Indeed, as discussed above, at each of Plaintiff's appointments with Nurse Huyck, she observed that Plaintiff had intact memory and intellectual functioning; demonstrated logical and linear thought process and showed no evidence of delusional framework; and had appropriate insight and judgment.  (ECF No. 8-1, PageID.733, 741-742, 751-752, 759, 765-766, 770-771, 779-780, 789, 794, 803, 811-812, 825, 833-834, 847, 860).

It is well-settled that an ALJ need not evaluate each piece of conflicting

evidence to show that the entire record was considered.  *See Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 445 (6th Cir. 2018) ("[T]he ALJ was not required to explain every piece of evidence in the record. . . . An 'ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Sys.–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999))).  Thus, the ALJ again complied with the articulation requirement to discuss the consistency factor as set forth in the revised regulations.  20 C.F.R. § 404.1520c(c)(2).

Plaintiff might wish "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).  But the law prohibits the Court from re-weighing the evidence and substituting its judgment for the ALJ's.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.")).  Because the ALJ properly evaluated and discussed the supportability and consistency of Nurse Huyck's opinions, the ALJ has satisfied the requirements of the regulations.

*See* 20 C.F.R. § 404.1520c(b)(2).

### C.    Subjective Symptom Evaluation

#### 1.    Standard

Plaintiff challenges the ALJ's consideration of Plaintiff's subjective

allegations and argues that he only used boilerplate language in his analysis and

thus failed to properly articulate his analysis of the evidence to allow the

undersigned to trace the path of his reasoning.  Under Social Security Regulations

(SSR), the ALJ was required to follow a two-step process when evaluating

Plaintiff's subjective symptoms.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL

1119029 (Mar. 16, 2016).  Under SSR 16-3p, an ALJ must analyze the consistency

of Plaintiff's statements with the other record evidence, considering his testimony

about pain or other symptoms with the rest of the relevant evidence in the record

and the factors outlined in that regulation.  This analysis and the conclusions drawn

from it—formerly termed a "credibility" determination—can be disturbed only for

a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th

Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th

Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word

'credibility' . . . to 'clarify that subjective symptom evaluation is not an

examination of an individual's character.'").

The ALJ must first confirm that objective medical evidence of the

42

underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged subjective symptom(s), considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of the symptom(s); (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication received; (6) any means used to relieve the symptom(s); and (7) other factors concerning functional limitations. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

The ALJ properly considered Plaintiff's testimony, noting Plaintiff's impairments and related symptoms warranted certain mental limitations, but he ultimately found that his statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with other evidence in the record. (ECF No. 8-1, PageID.48). As noted above, the ALJ concluded that while Plaintiff's impairments could be expected to cause his alleged symptoms, the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical and other evidence of record. (*Id.*).

## 2. Discussion

The analysis here largely echoes that of the previous section of this opinion. The ALJ properly considered Plaintiff's statements about the limiting effects of his symptoms and found them to be inconsistent with the record as a whole, including the objective medical evidence, Plaintiff's course of treatment, and the type of

medication used to treat his symptoms.  (*Id.*, PageID.48-49); *see* 20 C.F.R. §
416.929(c)(3); SSR 16-3p.

Here, the ALJ acknowledged Plaintiff's testimony that he had hallucinations
daily, (ECF No. 8-1, PageID.48), but cited treatment records showing Plaintiff
"generally did not appear to be responding to internal stimuli" and showed "no
evidence of a delusional framework."  (*Id.*).  Additionally, the ALJ acknowledged
Plaintiff's testimony that he has difficulty with memory, concentration, and
confusion, but the ALJ explained that his mental status examinations showed that
his "memory was generally intact"; he "was often attentive"; his thought process
was "often logical and linear"; and he was generally "alert and oriented" and
"cooperative."  (*Id.*, PageID.48).

Plaintiff further contends that the ALJ's "boilerplate" conclusion was
improper.  (ECF No. 11, PageID.897).  But, as explained above, the ALJ did more
than simply set forth a conclusion that Plaintiff's subjective complaints were not
entirely supported; he went through Plaintiff's impairments and provided
permissible reasons why his allegations were not fully substantiated.  Moreover,
this case is distinguishable from the case Plaintiff cites in support of his argument,
*Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 260 (6th Cir. 2015), where the
ALJ's only explicit reference to the claimant's "credibility" was the boilerplate
statement that the allegations were not supported by the record with no explanation

for that finding.  Here, the ALJ did include the boilerplate statement that Plaintiff's allegations were not supported by the record, but also provided a "thorough explanation elsewhere of his reasons for doubting [Plaintiff's] account."  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Taking Plaintiff's impairments into account, while the ALJ found he could perform the full range of work at all exertional levels, the ALJ also limited Plaintiff to simple instructions and to making simple work-related decisions; never engaging in commercial driving; never climbing ladders, ropes, or scaffolds; and no production pace work, such as assembly line work.  (ECF No. 8-1, PageID.47).  Ultimately, Plaintiff bears the burden of showing that he is limited beyond the RFC.  *See* 20 C.F.R. §§ 404.1512, 416.912; *Her v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).  The undersigned agrees with the Commissioner that Plaintiff has not met this burden, but instead asks the Court to impermissibly reweigh the evidence.  *Mullins v. Sec'y of Health & Hum. Servs.*, 680 F.2d 472 (6th Cir. 1982).  Instead, the undersigned finds that the ALJ's opinion is supported by substantial evidence based on the record before the Court, which is all that is required to affirm the ALJ's decision.  *See Blakley*, 581 F.3d at 406 (holding that "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." (internal quotations omitted)).

45

Because the ALJ's weighing of opinion evidence and subjective symptom evaluation are supported by substantial evidence, his decision should be affirmed.

## VI.   Conclusion

In the end, although the record shows that Plaintiff suffers from some impairments, the ALJ found Plaintiff was not disabled and that his impairments did not rise to the level of precluding Plaintiff from performing work consistent with the RFC crafted by the ALJ.  Substantial evidence supports the Commissioner's decision that Plaintiff was not disabled within the meaning of the Act.

Accordingly, for the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment, (ECF No. 11), be **DENIED**; the Commissioner's motion for summary judgment, (ECF No. 15), be **GRANTED**; and the ALJ's decision be **AFFIRMED**.


Dated: August 6, 2024                    s/Kimberly G. Altman___
Detroit, Michigan                         KIMBERLY G. ALTMAN
                                          United States Magistrate Judge


## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the court determines that any objections are without merit, it may rule without awaiting the response.

47

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 6, 2024.

<u>s/Carolyn Ciesla</u>
CAROLYN CIESLA
Case Manager